1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ANA M. MENJIVAR**
Plaintiff - Pro Se
4678 Sunland Avenue
Santa Rosa, CA 95407
Telephone: 415-420-4637
Facsimile: 707-585-9038
vpd520@yahoo.com

# E-filing

### IN THE UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

ANA M. MENJIVAR,
A citizen of California,

        Plaintiff,

vs.

PILLAR PANAMA, S.A., a Panamanian
Corporation;  PILLAR PANAMA U.S., LLC,
A Minnesota and/or New York corporation;
JOE HALEY, a citizen of Minnesota;
CHRIS NOLAN, a citizen of New York;
SCOTT HARRIS, a citizen of Utah;
WRIGHT THURSTON, a citizen of Utah;
INTERIOR JAM LLC,  a limited liability
corporation of Minnesota,  JAN BARTONE,
a citizen of Minnesota and/or New York;
MARY HEITHER, a citizen of Minnesota,

        Defendants,

**CV 08 2169**

**Case No.**

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff complains of defendants and alleges to the court the following:

### VENUE

Venue is appropriate in this court because this matter involves and breach of contract.  The

contract was executed by plaintiff in this venue and  a substantial amount of the acts and

omissions giving rise to this lawsuit  occurred in this district.

COMPLAINT Menjivar v. Pillar

**INTRADISTRICT ASSIGNMENT**

This lawsuit should be assigned to the San Francisco Division of this Court because a substantial part of the events or omissions which give rise to this lawsuit occurred in Sonoma County.

**JURISDICTION**

This court has jurisdiction over this complaint because it arises under the laws of the United States. This action is of a civil nature involving, exclusive of interest and costs, a sum in excess of $75,000. Every issue of law and fact is wholly between plaintiff who resides and is a citizen of a different state from those in which defendants reside and of which they are citizens.

**JURY DEMAND**

Plaintiff demands a jury trial on all issues.

**I.**
**PARTIES**
[28 USCA 1332(a); FedRCivP 8(a)(1)]

1. Plaintiff ANA M. MENJIVAR is, and was at all times mentioned, domiciled in and a citizen of the State of California.

2. PILLAR PANAMA, S.A. is a corporation existing under the laws of the Republic of Panama, South America. PILLAR PANAMA, U.S. LLC is a limited liability corporation organized and existing under the laws of the State of Minnesota with its principal place of business at 100

/ / /

1

COMPLAINT Menjivar v. Pillar

East Second Street, #200, Chaska, MN. (Plaintiff also believes that defendant PILLAR

PANAMA, U.S. may have a new, or secondary address at 4770 Sunrise Highway #103,

Massapequa Park, New York. Both defendants will be collectively referred to as "PILLAR.")

3. Defendant JOE HALEY resides in Carver, Minnesota, and, at all times mentioned herein was

the partner, CEO and/or president of defendant PILLAR.

4. Defendant CHRIS NOLAN resides in the State of New York and at all times herein

mentioned was the Vice President of Sales and/or Senior Vice President of Company

Operations of defendant PILLAR.

5. Defendant SCOTT HARRIS resides in the State of Utah and at all times herein mentioned

was a partner and Executive Vice President of defendant PILLAR.

6. Defendant WRIGHT THURSTON resides in the State of Utah and at all times herein

mentioned was a partner of defendant PILLAR.

7. Defendant INTERIOR JAM is a limited liability corporation duly organized and existing

under the laws of the State of Minnesota with its principal place of business located at 5341

Highpointe Terrace, Bloomington, MN.

8. Defendant JANICE BARTONE is director, owner, manager or partner of defendant

INTERIOR JAM and resides in the State of New York.

9. Defendant MARY HEITHER is director, owner, manager or partner of defendant INTERIOR

JAM and resides in the State of Minnesota.

10. Plaintiff is informed and believes that each defendant was the agent and employee of the

remaining defendants and was acting within the course and scope of such agency and

employment at all times as herein alleged.

## II.
## JURISDICTION

11. This action is of a civil nature involving, exclusive of interest and costs, a sum in excess of

$75,000. Every issue of law and fact is wholly between plaintiff who resides and is a citizen

of a different state from those in which defendants reside and of which they are citizens.

## III.
## CAUSES OF ACTION
### First Count
### [Breach of Contract]

12.    In or about, January, 2004, plaintiff attended a real estate investment seminar in South San Francisco, California, presented by defendant WRIGHT THURSTON (who would later become a partner of defendant PILLAR and/or the Red Frog Beach project)  Amongst the different speakers at the event was a representative for defendant PILLAR.  PILLAR's representative, a former partner,  invited plaintiff and other investors to visit Panama, South America, during one of PILLAR's sponsored tours and invest in the PILLAR's  resort investment project known at the time as *Red Frog Beach Club*" (hereafter referred to as "Red Frog"). PILLER's presentation touted the proposed resort as "Paradise Defined."  The ultimate project included 110 single–family lots and 60 condo/hotel units and 25 boathouses for a total of 195 units.

13.    In or about, February, 2004, Plaintiff accepted defendants' invitation and paid approximately $2,000 to PILLAR for the sponsored  "tour" to Panama, South America. Consequently, in March, 2004, plaintiff visited the proposed site for the real estate investment opportunity located on the Caribbean side of Panama in an archipelago known as Bocas Del Toro.  Plaintiff and several other investors from the United States were given a presentation by PILLAR partners about the benefits of owning real estate in Panama and investing in defendant's project.  Among the representations made by defendants was that they had researched the Panama and Bocas Del Toro real estate market and determined that the markets had tremendous potential for growth; that the Panamanian government was welcoming of foreign real estate investors.  Other benefits of the investment would be: "[l]ow cost, no maintenance, solar power, high quality sanitary, water filtration, interlocking pavers [sic] with island street lights, consistent, no headaches." Further, defendants represented to plaintiff that they would provide high quality mason construction and  *100%*" maintenance, marketing and management of the investment properties. Moreover, the defendants represented that they would assist in obtaining financing in order to purchase the investment properties.

14.    Defendant JOE HALEY was present during the entire March 2004 tour with plaintiff and provided a power point presentation to plaintiff and the other investors. To the best of plaintiff's

COMPLAINT Menjivar v. Pillar Panama

1    recollection, defendant SCOTT HARRIS also was present during this time but arrived towards

2    the end of the tour.

3    15.    While in Panama, plaintiff committed to purchasing two lots upon which villas would be

4    built. Plaintiff signed defendants' "Acknowledgment, Consent and Reservation" which allowed

5    plaintiff to reserve for purchase, two lots and villas from PILLAR.  Plaintiff and defendant JOE

6    HALEY signed this document on March 7, 2004. Plaintiff further agreed to pay approximately

7    $17,500 reservation fee per unit.  Plaintiff paid the reservation fee when she returned to the

8    United States.  Plaintiff wired $27,500, on or about March 12, 2004, to defendant  PILLAR

9    from her local bank in northern California, in order to reserve her selected lots and villas.

10   16. Plaintiff chose the following lots and villa styles:

11   **A. <u>Tortuga Villa – Lot 21</u>**

12        Plaintiff agreed to purchase a lot consisting of "1723.397 square meters," identified as

13   "block 2, lot 14 of Finca No. 746" (later re-numbered and identified as Lot 21) for $20,000.00.

14   Plaintiff also decided on a 3 bedroom, two bath villa, model name "La Tortuga 3" which was to

15   be built on the property. The total purchase price for the lot and villa was $315,750.00 U.S.

16   dollars (before added upgrades).   30% of the total purchase price was required and on or about

17   June 24, 2004, plaintiff wired a total of $152,052.00 to Pillar Panama from her local credit

18   union in northern California of which $80,975.00 represented a down payment towards the

19   Tortuga villa.  Defendants have acknowledged receipt of these funds

20   **B. <u>Cymbidium Villa – Lot 36</u>**

21        Plainitff also agreed to purchase a lot of land of "1980.518 square meters," identified as

22   "block 2, lot 21 of Finca No. 746" (later re-numbered and identified as Lot 36) $15,000.00.

23   Plaintiff selected a 2 bedroom, two-1/2 bath villa, model name **"Cymbidium 2"**  to be built on

24   the lot. The total purchase price before upgrades for the lot and villa was $282,750.00 U.S.

25   dollars. Plaintiff wired a total of $152,052.00 to Pillar Panama from her local credit union here

26   in northern California of which $71,075.00 represented the down payment towards the

27   Cymbidium villa.  Defendants have acknowledged receipt of these funds.

     /  /  /

28   COMPLAINT Menjivar v. Pillar Panama

## C. **Purchase Agreement**

In or about June, 2004, PILLAR delivered two purchase contracts to plaintiff in Santa Rosa, California, via a local delivery company (e.g. FedEx, UPS, DHL, etc) - one for each villa. Both agreements were identical in content except for the differing property descriptions and prices. On June 25, 2004, Plaintiff signed both contracts labeled "Promise to Purchase and Construction Agreement of Condos/Villas" [hereafter referred to as the "Purchase Agreement] in California and returned them to PILLAR via the same method she had received them. Plaintiff's recollection is that the purchase contracts were returned to an address in the United States. Copies of the purchase agreements are attached as "**Exhibit A**" (hereafter referred to as "Tortuga Agreement") and "**Exhibit B**" (hereafter referred to as Cymbidium Agreement) and are made a part of this complaint.

17.    Defendants subsequently offered plaintiff several upgrade options for the Tortuga villa. These options were presented over the telephone and via internet.  Plaintiff made several upgrade selections totaling approximately $98,482.54.  Plaintiff was required to submit an additional 30% of the total upgrade amount.  Consequently, plaintiff promptly wired or otherwise paid PILLAR an additional $33,725.00.  Defendants have acknowledged receipt of this these funds.

18.    Plaintiff made upgrade selections of approximately $36,263.10 for the Cymbidium villa but refused to pay any additional monies due to serious concerns about the stability of the project which were surfacing at the time as explained below.

19.    All conditions precedent have been performed by plaintiff or have occurred.

## **Breach of Contract**

20.    The completion of the villas was to take place *"within a maximum term of thirty (30) calendar months counted starting from the date of the signature of* this *contract or up to the First (1st) of January of two thousand and seven (2007)."*

21.    PILLAR has failed and neglected to perform in that, by the terms of the agreements which were drawn and prepared by PILLAR, PILLAR contracted with plaintiff, for valuable consideration, to build two (2) separate villas upon two (2) separate lots of land in the Country

COMPLAINT Menjivar v. Pillar Panama

1  of Panama, South America, on the Caribbean side of Panama in the archipelago known as Bocas

2  Del Toro – specifically on the island known as Isla Bastimientos.

3  22.    As of the date of the filing of this lawsuit, none of the villas are completed or ready for

4  residency.  The Tortuga villa appears to be nearest to completion in that the shell of the villa is

5  intact.  However, doors, windows, walls, bathroom and kitchen appliances, floors, landscaping,

6  swimming pool, etc. , are still missing.  The villa has been allowed to remain in this unfinished

7  condition, to plaintiff's knowledge, since  January, 2007.

8  23.    Only the foundation of the Cymbidium villa appears to have been started and plaintiff

9  cannot determine if that is complete.

10  24.    On or about October 22, 2007, plaintiff sent defendants JOE HALEY, CHRIS NOLAN,

11  SCOTT HARRIS and WRIGHT THURSTON an email rescinding both purchase agreements and

12  demanding the return of all her payments plus associated damages.   To date, the defendants

13  have not returned any monies to plaintiff. (Attached as **Exhibit C** to this complaint is a copy of

14  that email.)

15       Wherefore, plaintiff demands judgment against defendants and each of them as set forth

16  below.

17                         **Second Count**
                           **[Fraud and Deceit]**
18

19  25.    Plaintiff incorporates Paragraphs 1 through 24 of the First Count [Breach of Contract] as

20  though fully set forth herein.

21  26.    Defendants made several oral and written representations to plaintiff, and other

22  similarly situated investors, to induce plaintiff to invest in Red Frog.  After having induced

23  plaintiff in making a substantial monetary investment, defendants changed and revised terms of

24  the agreements between plaintiff and defendants;  purposefully withheld information about the

25  financial health of the project from plaintiff and attempted to intimidate plaintiff once she

26  became vocal about an of her concerns.  Furthermore, plaintiff is informed and believes and

27  thereon alleges that, at the point where defendants realized they were having financial

28  COMPLAINT Menjivar v. Pillar Panama

difficulties, defendants devised numerous schemes to defraud plaintiff, and other investors, out of more money by inventing and implementing costs and fees as described below.

27.    Among the oral and written representations made by defendants to plaintiffs were the following:

A)    Defendants represented that the Red Frog  project was going to be a small community of villas and condos.   However, the number of condos and villas ballooned from the initially represented 195 total units to approximately 900 condominiums and villas.

B)    Defendants represented that construction of plaintiff's villas was on schedule and that closings would begin to occur in late 2006 or early 2007.   On or about November 13, 2006, plaintiff was contacted by a RFB representative, Kevin Canary who informed her that the targeted closing date for the Cymbidium villa [sic] was December 19 -22, 2006. (This had to be an error as plaintiff knew that Tortuga villa was further along in the completion process than Cymbidium)  Additionally, on or about November 22, 2006, plaintiff was notified via email by defendants' attorney, Tatiana A. deBuron, that the closing date on [Tortuga] villa  would be January 3, 2007

C)    Defendants represented that the celebrity Arnold Palmer had  signed a contract with PILLAR to design a golf course.   This claim was either untrue or never consummated, thus, Arnold Palmer is no longer associated with the project.   Nonetheless, defendants advertised and widely promoted this matter.

D)    Defendants represented that, according to paragraph 30 of plaintiff's  Purchase Agreement and other documents,  defendant PILLAR would assist plaintiff with the financing of the villas and that financing the villas in Panama would be a fairly simple process as there "were many banks" that would be willing to help plaintiff.   In reality, plaintiff was ultimately left to seek financing on her own and was advised by Nelly Guerrra, of Banco General, a Panamanian financial institution, that these type of loans are granted only where the property is for use as a primary residence and not for investment purposes.

E)    Defendants represented that according to paragraph 19 of the Purchase Agreement investors would have the right to a walk through review of the properties prior to closing.   In fact, defendants refused to allow an inspector of plaintiff's choice, to inspect her villas during the

1   construction phase.   It has subsequently been reported to plaintiff that much of the

2   construction on the villas has been shoddy.

3       F)  Defendants represented that because the villas were nearing completion,  plaintiff

4   needed to furnish the villas so that they would be "rent ready."  Plaintiff, subsequently, paid in

5   excess of $60,000 to defendants  for furnishings.   It became apparent to plaintiff, shortly after

6   having paid this money to defendants, that the villas were not going to be completed in the near

7   future and that she needlessly paid the funds to defendants.   Plaintiff has made demands to the

8   defendants for the return of her funds but defendants have failed and/or refused to return

    plaintiff's money as described below the plaintiff's complaint.

9       G)  In a letter from defendant CHRIS NOLAN  sent to plaintiff and other investors,

10  defendants attempted to assess "homeowners association fees" of approximately $350.00 per

11  villa in order to pay for transport, road and storm drain maintenance, landscaping of common

12  areas, beach cleaning and lifeguards, security and emergency support, fire safety and

13  administrative staff.   Defendants attempted to impose these association fees despite the fact

14  that:  1) the project was mostly uninhabitable; and 2) none of the investors, including plaintiff

15  had ever agreed to these fees or been informed of them prior to entering this agreement.

16      H)   Defendants represented that additional building fees were needed from plaintiff for

17  the Cymbidium building in order to pay for excavation and retaining walls.  Such additional fees

18  were never addressed in plaintiff's Purchase Contract.

19      I)   Defendants represented that plaintiff's villa closings were imminent and that she

20  needed to have her financing in order by the stated closing dates or risk the loss of her deposits.

21      J)   Defendants fraudulently attempted to insert an unlawful closing cost in plaintiff's

22  closing cost estimate requiring plaintiff to make a mandatory contribution towards the Red Frog

23  Foundation, a non-profit organization established by defendants to assist in the local

24  community.   Defendant later claimed this cost was a "voluntary" payment.

25      K)   Defendants advised plaintiff and other investors that it would be beneficial to

26  establish an international business corporation for each villa prior to the completion of the

27  villas.   Plaintiff invested in the corporations as defendants recommended.  Plaintiff later was

28  advised by plaintiff's  Panamanian lawyer, that it was unnecessary to incorporate until the villas

COMPLAINT Menjivar v. Pillar Panama

were built and ready for occupancy.  Meanwhile, plaintiff paid defendants, through its agent PNL Consultants, Inc.,  approximately $5,000.00 for creating and maintaining the unnecessary corporations.

L)  In an apparent desperate move to compel investors to close on villas that were otherwise, obviously, not completed or suitable for habitation, defendants forwarded an email to plaintiff, and other investors, dated January 6, 2007, signed  from "Your Red Frog Beach Team." In that email, defendants stated that closing procedures differed in Panama in that a home "may receive its Certificate of Occupancy, and therefore may legally close, at a much earlier date of completion than when a home in the United States would."  Plaintiff's Panamanian attorney verified to plaintiff in response to defendants' email that "Red Frog is deceiving people" and that what was said in defendants' email was not accurate.

28.    When defendants made the representations listed above, they knew them to be false and made these representations with the intention to deceive and defraud plaintiff and to induce plaintiff to act in reliance on these representations in the manner hereafter alleged, or with the expectation that plaintiff would so act.

29.    The plaintiff, at the time these representations were made by the defendant and at the time the plaintiff took the actions herein alleged, was ignorant of the falsity of the defendant's representations, the plaintiff was induced to, among other things,  enter into two purchase agreements with defendants; pay defendants substantial sums of money as a down payment on the villas; pay for unnecessary furnishings,  and,  pay prematurely, for the creation of international business corporations..  Had the plaintiff known the actual facts, she would not have taken such actions.

30.    As a proximate result of the fraudulent conduct of the defendants as herein alleged, the plaintiff was induced to spend in excess of  $218,277.00 in addition to the costs of unnecessary furnishings and incorporation costs.

31.    Defendants' acts alleged above were willful, wanton, malicious, and oppressive, were undertaking with the intent to defraud and justify the awarding of exemplary and punitive damages.

COMPLAINT Menjivar v. Pillar Panama

Wherefore, plaintiff demands judgment against defendants and each of them as set forth below.

## Third Count
### [Negligent Misrepresentation]

32.    Plaintiff incorporates Paragraphs 1 through 24 of plaintiff's First Count and Paragraphs 26 through 27A-L of plaintiff's Second Count against defendants and makes such paragraphs a part hereof.

33.  Defendants uttered representations to plaintiff to induce her to contract with defendants for the villas and furnishings as described in this complaint.  Defendants' representations about developing Red Frog Beach resort were false.

34.    When the defendant made these representations, it had no reasonable ground for believing them to be true.

35.    The defendant made these representations with the intention of inducing the plaintiff to act in reliance on these representations in the manner hereafter alleged, or with the expectation that the plaintiff would so act.

36.    Plaintiff reasonably relied on defendants' false representations and entered into the contract(s) described in this complaint.

37.    As a proximate result of defendants' negligent misrepresentations, plaintiff has suffered substantial damages.

Wherefore, plaintiff demands judgment against defendants and each of them as set forth below.

## Fourth Count
### [Conversion]

38.    Plaintiff incorporates Paragraphs 1 through 24 of plaintiff's First Count and Paragraphs 26 through 27A-L of plaintiff's Second Count against defendants and makes such paragraphs a part hereof.

39.    The concept of Red Frog Beach Club, as described by defendants was that it would be a residential resort community which was to include marinas, beach club and spa, golf course and

1   restaurants.  It was plaintiff's intention to reside seasonally in the villas and lease them out the

2   remainder of the time.  Eventually, plaintiff planned to retire and reside in the Tortuga villa.

3   40.    As an owner of the villas, plaintiff had the option of belonging to the Rental Management

4   program and listing her properties with the Red Frog Property Management team in order to

5   facilitate the rental of the villas.  As an investor, plaintiff recognized the opportunity to profit by

6   the rental of her villas, as well as, the obvious financial assistance with the villa financing.  An

7   absolute requirement for making the villas marketable was that they be fully furnished

8   according to written standards set by defendants.    Consequently, if the villas were not

9   furnished, they could not be rented out.    Plaintiff believed, based upon defendants'

10  representations, that the villas were being built and that a completion date for both villas was

11  imminent.

12  41.    In late 2005 or early 2006. plaintiff was contacted via written correspondence by

13  defendant INTERIOR JAM, JANICE BARTONE and MARY HIETHER (referred to collectively

14  hereafter as INTERIOR JAM.  Defendant JANICE BARTONE is defendant JOE HALEY's

15  mother.).    In that letter, defendants INTERIOR JAM stated, among other things, that *"Red

16  Frog Beach Club ha[d] chosen Interior Jam  to be the exclusive design team to assist [plaintiff]*

17  *in maximizing [plaintiff's] investment.."*

18

19  42.    Plaintiff subsequently consulted with INTERIOR JAM to assist her in selecting, among

20  other things, appropriate furnishings so that the villas would qualify for rental under the Rental

21  Management program.  INTERIOR JAMS first assisted plaintiff in selecting approximately

22  $43.003.96  worth of furnishings for that villa.    Consequently, plaintiff withdrew sums of

23  money from her retirement account in order to finance the $43,003.96 worth of furnishings and

24  paid PILLAR in full in or about April and May, 2006.

25  43.    Plaintiff paid defendants INTERIOR JAM a $250 consultation fee for the Tortuga Lot in

26  or about July, 2006.

27  44.    Subsequent to purchasing furnishings for the Tortuga Villa, plaintiff was again contacted

28  by defendants INTERIOR JAM regarding the furnishings for Cymbidium villa. In all, plaintiff

1    selected approximately $35,856 worth of furnishings for Cymbidium villa.  However, plaintiff

2    readily admitted that she was going to have great difficulty obtaining the funds for this

3    purchase.  Defendant JAN BARTONE persisted in contacting plaintiff to offer suggestions as to

4    how plaintiff could finance the furnishings.  Plaintiff questioned BARTONE and defendants

5    about the need to purchase the furniture at this point since the progress on this villa was

6    significantly behind that of the Tortuga villa.  Defendants convinced plaintiff that it would be

7    less expensive for plaintiff to purchase the furnishings at this point.  Plaintiff, upon defendants'

8    strong recommendations and persistence,  placed an order for furnishings for the Cymbidium

9    villa on or about July 5, 2006.

10    **45.**    In or about, July 17, 2006, plaintiff paid INTERIOR JAM $500 consultation fee for the

11    Cymbidium lot.

12    **46.**    At about the time that plaintiff was financing the furnishings for both villas, news of the

13    workers' strikes, lack of funds and other problems revolved around Red Frog.  Such news

14    greatly concerned plaintiff.  It became apparent to plaintiff, and the other investors, that the

15    villas would <u>not</u> be completed in the near future.   In fact, some time shortly after plaintiff paid

16    for the furnishings, work on the entire project apparently came to a complete halt.  Plaintiff was

17    hesitant about providing any more funds towards anything associated with Red Frog Beach.  On

18    or about November 6, 2006, plaintiff notified one of PILLAR's representatives that she no

19    longer wished to complete the furniture transaction and requested an accounting of any

20    furniture that had been ordered on plaintiff's behalf.  Plaintiff further requested the return of

21    any monies for any furnishings that had not been ordered.  (Attached to this complaint as

22    **Exhibit D** are the emails between plaintiff and defendant's representatives.)

23

24    **47.**    In a response to an email dated November 7, 2006, PILLAR's representative, EJ

25    Gorman, claimed that plaintiff's furnishings had already been ordered and that a "30% re-

26    stocking fee" would be charged for any cancellation.  In plaintiff's response of the same date,

27    plaintiff informed PILLAR's representative that there had been no written policy in effect

28    regarding a "30% re-stocking fee" or cancellation policy and protested that the amount was

12

exorbitant. Plaintiff is informed and believes and thereon alleges that this was a tactic routinely used by defendants in an attempted to control and intimidate plaintiff and other investors.

48.    In or about, November, 2006, defendants relented and agreed to cancel plaintiff's furniture order and not impose a 30% re-stocking fee. However, defendants never provided an itemization of furnishings which purportedly had already be purchased on plaintiff's behalf. Due to continued grave concerns regarding the financial stability of the Red Frog project, plaintiff was compelled to hire a Panamanian attorney named Manuel Berrocal, to protect plaintiff's interest. Attorney Berrocal demanded, among other things, that Red Frog provide a itemized listing of all furnishings purchased by defendant for plaintiff's villas. Attorney Berrocal never received the listing.

49.    From November, 2007, until June, 17, 2007, defendants retained a total of $60,931.96 of plaintiff's money for furnishings allegedly purchase for her villas which were soon to be completed.   All during this time, defendants, via written newsletters and telephone conference calls (with other investors including plaintiff) continued to issue positive assurances that the project was progressing well and that villa construction would resume shortly. The reality was that defendant PILLAR was not in a financial position to complete the project as promised to plaintiff.   Defendants knew, or should have known, that the villas would not be completed as represented and fraudulently obtained the funds for the furniture from plaintiff.

50.    On or about June 17, 2007, despite defendants reassurances to the contrary, all construction was still halted on the project and there was no indication that work would resume any time soon.  On that date, plaintiff sent an email to defendant SCOTT HARRIS demanding the return of all of her furniture monies (i.e. a total of $60,931.96). (Attached to this complaint as **Exhibit E** is a copy of plaintiff's email.) Defendant HARRIS responded to plaintiff's email and, through several subsequent emails, confirmed that the monies would be returned to plaintiff. Defendant HARRIS further claimed that defendant PILLAR had secured a business partner to help fund the Red Frog project and that plaintiff would receive her funds once the escrow between defendants and the new partners closed. Defendant HARRIS also confirmed

13

that matters were, once again, looking very positive for the Red Frog project. In the interim, defendants compelled plaintiff to sign a "Cancellation of Design Center Purchase Agreement Addendum." After several revisions of the Cancellation agreements, plaintiff executed the agreements along with defendant SCOTT HARRIS. The provisions of the Cancellation agreements required that the terms of said agreement be kept confidential. Therefore, a copy of the cancellation agreements are not attached to this complaint. However, plaintiff will immediately provide copies of the agreements upon request by this Court to do so.

51. As of November 16, 2007, defendant PILLAR reimbursed plaintiff for the Cymbidium furnishings in the amount of $17,928 plus penalties. However, defendants have not completed the agreement as required and $150 is still owing to plaintiff under said agreement. Plaintiff has requested this additional $150 but defendants have ignored her request.

52 As of the date of the filing of this complaint, defendants have not refunded any portion of the Tortuga villa furnishings to plaintiff in accordance to their cancellation agreement, i.e. $43,003.96 plus daily penalties.

53. In or about April and May, 2006, defendants converted to their own use, $43,003.96 in cash which plaintiff gave to defendants, in good faith, for defendants to purchase furnishings selected by plaintiff, with the direct assistance of defendant JOE HALEY's mother, JANICE BARTONE. Plaintiff is informed and believes and thereon alleges that defendants converted plaintiff's funds for their own use as plaintiff has come to learn that defendants are having significant financial problems. Plaintiff is further informed and believes and thereon alleges that defendants never purchased all of plaintiff's furnishings, or, conversely, if the defendants did, indeed, purchase the furniture, the defendants have now sold or otherwise disposed of plaintiff's furnishings without her consent or permission and without reimbursing the total value of the furnishings to her.

54. Defendants' acts alleged above were willful, wanton, malicious, and oppressive, were undertaking with the intent to defraud and justify the awarding of exemplary and punitive damages.

COMPLAINT Menjivar v. Pillar Panama

14

1    Wherefore plaintiff demands judgment against defendants, and each of them, as set

2  forth below.

3                                **Fifth Count**
                         **[Breach of Fiduciary Duty]**
4

5  55.    Plaintiff incorporates Paragraphs 1 through 24 of plaintiff's First Count  and Paragraphs

6  26 through 27A-L of plaintiff's Second Count  and Paragraphs 39 through 53 of Plaintiff's Fourth

7  Count against defendants and makes such paragraphs a part hereof.

8  56.    Plaintiff, and other similarly situated investors of the Red Frog Beach project, reposed

9  their trust  and confidence in defendant PILLAR  and expected that PILLAR would take

10  plaintiff's investment and apply the funds as contracted.   Moreover, plaintiff expected that

11  defendant PILLAR would operate the development in a financially responsible manner.

12  Defendants PILLAR owed plaintiff a fiduciary obligation to act within a reasonable standard of

13  care and honesty and a duty of full disclosure to the plaintiff.   Defendants, instead have

14  mismanaged funds including plaintiff's investment all to plaintiff's great detriment.

15  57.    As a proximate result of defendants' breach fiduciary duty, plaintiff has suffered

16  substantial damages as described herein.

17  58.    Defendants' breach of fiduciary duty evinces a conscious disregard of plaintiff's rights,

18  interests and well being entitling plaintiff to an award of punitive and exemplary damages in a

19  sum to punish and to make an example of defendants.

20    Wherefore plaintiff demands judgment against defendants, and each of them, as set

21  forth below.

22                                **Sixth Count**
             **[Breach of the Covenant of Good Faith & Fair Dealing]**
23

24  59.    Plaintiff incorporates Paragraphs 1 through 24 of plaintiff's First Count  and Paragraphs

25  26 through 27A-L of plaintiff's Second Count  and Paragraphs 39 through 53 of Plaintiff's Fourth

26  Count against defendants and makes such paragraphs a part hereof.

27  60.    Defendants breached the implied covenant of good faith and fair dealing arising from

28  their contract with plaintiff. Panama

61.   As a proximate result of defendants' breach of the implied covenant of good faith and fair dealing, plaintiff has suffered substantial damages.

62.   Defendants' breach of the implied covenant of good faith and fair dealing evinces a conscious disregard of plaintiff's rights and well being entitling plaintiff to an award of punitive and exemplary damages in a sum to punish and to make an example of defendants.

Wherefore plaintiff demands judgment against defendants, and each of them, as set forth below.

### Seventh Count
### [Intentional Infliction of Emotional Distress]

63.   Plaintiff incorporates Paragraphs 1 through 24 of plaintiff's First Count  and Paragraphs 26 through 27A-L of plaintiff's Second Count  and Paragraphs 39 through 53 of Plaintiff's Fourth Count against defendants and makes such paragraphs a part hereof.

64.   Defendants' wrongful conduct, breaches of common law duties and statutory violations, as herein alleged, have resulted in the intentional infliction of emotional distress upon plaintiff.

65.   Defendants' actions were especially egregious in that when defendants became aware that plaintiff had  voiced her disillusionment with the handling of the Red Frog Beach project, defendants, specifically CHIRS NOLAN, telephoned plaintiff in an attempt to intimidate her by claiming that she was  "disparaging" Red Frog Beach.  .

66.   As a proximate result of defendants' intentional infliction of emotional distress,  plaintiff has suffered substantial damages.

67.   Defendants' intentional infliction of emotional distress evinces a conscious disregard of plaintiff's rights, interests and well being entitling plaintiff to an award of punitive and exemplary damages in a sum to punish and to make an example of defendants.

Wherefore, plaintiff demands judgment against defendants and each of them as set forth below.

/  /  /

COMPLAINT Menjivar v. Pillar Panama

**Eighth Count**
**[Negligent Infliction of Emotional Distress]**

**68.**    Plaintiff incorporates Paragraphs 1 through 24 of plaintiff's First Count and Paragraphs 26 through 27A-L of plaintiff's Second Count and Paragraphs 39 through 53 of Plaintiff's Fourth Count against defendants and makes such paragraphs a part hereof.

**69.**    Defendants' wrongful conduct, breaches of common law duties and statutory violations, as herein alleged, have resulted in the negligent infliction of emotional distress upon plaintiff.

**70.**    As a proximate result of defendants' negligent infliction of emotional distress, plaintiff has suffered substantial damages.

WHEREFORE, plaintiff demands judgment against defendants and each of them, for each count and cause of action as set forth below:

A.    Judgment against defendants or such of them as the court may determine to be liable to plaintiff;

B.    For compensatory damages in the sum of $218,277.00;

C.    For compensatory damages in the sum of $43,003.96;

D.    For special damages according to proof;

E.    For interest on amounts owed;

F.    For reasonable attorneys' fees according to proof;

G.    For loss of economic benefit;

H    For clear and unencumbered title to the lots paid for by plaintiff;

I.    For penalties as specified in defendants' "Cancellation of Design Center Purchase Agreement Addendum(s)" dated July 31, 2007;

J.    For punitive and exemplary damages;

K.    For costs of suit herein incurred; and

L.    For such other and further relief as the court may deem property.

Dated: _April 28_, 2008

ANA M. MENJIVAR,
Plaintiff, Pro Se

COMPLAINT Menjivar v. Pillar Panama

**EXHIBIT    A**



## PROMISE TO PURCHASE AND CONSTRUCTION AGREEMENT OF
## CONDOS / VILLAS

_____Joe Haley_____ (REPRESENTATIVE OF PILLAR PANAMA), man/woman, citizen of
U.S.A., bearer of the identification card/passport number 75963157, with office at Almirante,
Bocas Del Toro Apartado 0104-00049, Panama, Republic of Panama acting in the name and
representation of PILLAR PANAMA, S.A., a Panamanian company duly registered at
Microjacket 440192, Redi Document 531092, since September 17, 2003, who from now on will
be referred to as THE PROMISING SELLER, on one hand and on the other **Ana Menjivar**
(REPRESENTATIVE OF BUYER), man/woman, citizen of _United States_, marital
status of _Single_, of age _46_, bearer of the identification card/passport number
_____, with residence at _4678 Sunland Ave Santa Rosa, CA_, acting in
his own name or acting in the name and representation of _Ten Ten Incorporated S.A._ (name of
corporation), a Panamanian company duly registered at Microjacket _456384_, Document
_630792_, since _06,21_, 2004, hereinafter referred to as THE PROMISING BUYER, by these
means celebrate a promise to purchase contract according to the following Clauses:

**FIRST:** THE PROMISING SELLER declares that as evidenced in Public Deed number 5052 of
May 20th, 2004, THE PROMISING SELLER is the rightfull owner of lot 746, Location Code
1003, Document Number 315200, Entry No. 1, of the Province of Bocas del Toro, Republic of
Panama, which consists of a lot of land of 23 Hectares plus 6499 square meters (PUBLIC
REGISTRY STATES 23 Hectares plus 6499 square meters). THE PROMISING SELLER
declares that it has total possession of the property at the moment of signature of this contract.

**SECOND:** THE PROMISING SELLER by these means assumes the obligation to sell to THE
PROMISING BUYER and THE PROMISING BUYER, in turn, assumes the obligation to buy from
THE PROMISING SELLER, the following:

a.  A lot of land of 1723.397 square meters, block __2__, lot __14__ of Finca No. 746. The
    boundaries and measurements of THE PROPERTY are those described in the attached plat map,
    which is set as **Annex A** of the present contract and becomes part of the same.

b.  A condo/villa, model name **La Tortuga 3** as per specifications set forth in **Annex B** of this
    contract.

The lot of land and condo/villa hereinafter will be jointly called THE PROPERTY.

**THIRD:** The sale and purchase that by means of the present contract the Parties commit to carry out, will take place within a maximum term of thirty (30) calendar months counted starting from the date of the signature of this contract or up to the First (1st) of January of two thousand and seven (2007).

THE PROMISING BUYER acknowledges that PROMISING SELLER may utilize THE PROPERTY as collateral for construction financing during the term of this agreement. The PROMISING SELLER agrees to eliminate all such burdens and liens before THE PROPERTY is transferred to PROMISING BUYER.

**FOURTH:** The price of sale of the property will be for the sum of **THREE HUNDRED FIFTEEN THOUSAND SEVEN HUNDRED AND FIFTY DOLLARS (US $315,750.00)**, currency of legal course of the United States of America. The sale price will be paid by THE PROMISING BUYER in the following manner:

(A) By means of a check on behalf of PILLAR PANAMA, S.A. for the amount of **THIRTEEN THOUSAND SEVEN HUNDRED AND FIFTY DOLLARS (US $13,750.00)**, currency of legal tender of the United States of America, at the moment of the signature of the the reservation contract signed by the parties on **March 9th, 2004**. THE PROMISING SELLER accepts to have received this money to its entire satisfaction.

(B) By means of a wire on behalf of PILLAR PANAMA, S.A. for the amount of **EIGHTY THOUSAND NINE HUNDRED AND SEVENTY FIVE DOLLARS (US $80,975.00)**, currency of legal tender of the United States of America, to cover the balance of the 30% down payment, Given to the PROMISING SELLER as a construction deposit for part payment of materials and labor, at the moment of signature of this contract. THE PROMISING SELLER accepts to have received this money to its entire satisfaction.

(C) The balance sum of **TWO HUNDRED TWENTY ONE THOUSAND AND TWENTY FIVE DOLLARS (US $221,025.00)**, will be paid by THE PROMISING BUYER by means of a Check or wire transfer in favor of PILLAR PANAMA, S.A., as soon as the Public Deed whereby THE PROMISING SELLER sells THE PROPERTY to THE PROMISING BUYER, is duly registered in the Public Registry.

(D) THE PROMISING BUYER acknowledges receipt and agreement of the client pricing worksheet that documents allowances chosen by THE PROMISING BUYER. By means of a

purchase agreement addendum, **Annex G,** final option allowance prices will be converted into actual option pricing within 180 days of his agreement that will finalize the final purchase price of the property.

**FIFTH:** THE PROMISING SELLER is obligated to sell and to pass over to THE PROMISING BUYER, THE PROPERTY object of this contract, free of obligations and must idemnify THE PROMISORY BUYER in the event of eviction.

**SIXTH:** The issuing and registration in the Public Registry of the Public Deed of sale and purchase will be responsibility of THE PROMISING SELLER. THE PROMISING BUYER will give THE PROMISING SELLER the documents here listed if PROMISING BUYER is a company:

a-    Good Standing certificate of the BUYER COMPANY.

b-    Minute whereby _____ is authorized by BUYER COMPANY to undertake the purchase and sale of the PROPERTY.

c-    Copy of annual franchise tax forms for BUYER COMPANY.

**SEVENTH:** In the event that THE PROMISING BUYER decides to not buy THE PROPERTY or that due to him upon construction completion, within the term pointed out in this contract, then, THE PROMISING SELLER will be entitled to retain for itself as indemnity the sum paid to such date, that is **EIGHTY THOUSAND NINE HUNDRED AND SEVENTY FIVE DOLLARS (US $80,975.00)** currency of legal tender in the United States of America.

**EIGHTH:** In the event that THE PROMISING SELLER defaults, it will return to THE PROMISING BUYER the sum of **EIGHTY THOUSAND NINE HUNDRED AND SEVENTY FIVE DOLLARS (US $80,975.00)** currency of legal course of the United States of America, received in payment as part of the sale price, as indemnity for losses and damages. This sum must be paid no later than thirty (30) days after having produced the nonfulfilment. Not receiving the appropriate governement approvals qualifes for nonfulfilment.

**NINTH:** THE PROMISING BUYER will assume the taxes and fees that arise from THE PROPERTY as of the date of registration of the sale and purchase deed in the Public Registry. THE PROMISING SELLER declares that all the taxes or fees that arise from lease and purchase of THE

PROPERTY up to the date of the registration of the sale and purchase deed in the Public Registry are properly paid.

**TENTH:** CHARACTERISTICS OF THE CONSTRUCTION OF THE CONDO/VILLA.

The residence will be approximately **142** square meters total area, complete construction specifications to follow, but including features as listed in PROMISING SELLER's specification, which is annexed to this contract as **Annex B**. A complete description of the property, in the form of a plat or survey map, is attached to this contract and forms part of the same as **Annex A**.

PROMISING SELLER will provide PROMISING BUYER with a very detailed specification document to be agreed upon before construction passes the foundation stage in **Annex F**. PROMISING BUYER will be responsible for choosing all standard choices of materials and options. PROMISING SELLER must comply with the quality and type of materials requested by PROMISING BUYER and agreed to in the **Annex F** by PROMISING SELLER.

**ELEVENTH**: Upon execution of this Agreement, and clearing of all contingencies, PROMISING SELLER shall continue to work with all reasonable diligence to final completion of villa.

**TWELFTH**: PROMISING BUYER agrees that the direction and supervision of the work forces, including subcontractors rests exclusively with PROMISING SELLER. PROMISING BUYER agrees not to interfere with or issue instructions to work forces, nor to contract for additional work with contractors or subcontractors except with PROMISING SELLER'S written permission. If permission is granted, such additional work shall not interfere with PROMISING SELLER 's completion of the construction of the home.

**THIRTEENTH: MODIFICATIONS**: Any significant change in the Plans and Specifications after **Annex F** is provided by PROMISING SELLER must be approved in writing by both parties citing by CHANGE ORDER any increase or decrease in the purchase price caused by such change. Unless otherwise agreed in writing, any such increase or decrease shall be reflected as an adjustment in the final purchase price. PROMISING BUYER agrees to pay a $500 fee for each CHANGE ORDER request and acknowledges that term under Section Three may be altered as a result. Materials of similar type and quality may be substituted without notice to or consent of PROMISING BUYER, so long as such change or substitution shall not substantially alter the character of the home or reduce the value thereof.

**FOURTEENTH: COMPLETION:** At closing, PROMISING SELLER shall furnish proper individual lien waivers for all labor and materials provided. PROMISING SELLER funds shall be escrowed for any work which cannot be completed because of weather conditions or because of mortgage requirements. Such escrowed funds shall be payable to PROMISING SELLER upon completion of such specified work.

**FIFTEENTH**: **PROMISING BUYER SHALL ASSUME** on date of closing all other special assessments levied as of the date of closing.

**SIXTEENTH: PROMISING SELLER SHALL PROVIDE FOR PAYMENT OF** special assessments pending as of the date of this Agreement for improvements that have been ordered by any assessing authorities.

**SEVENTEENTH**: General Warranties: PROMISING SELLER warrants that buildings are or will be constructed entirely within the boundary lines of the Property. PROMISING SELLER warrants that there is a right of access to the property from a public right of way.

**EIGHTEENTH: RISK OF LOSS:** If there is any loss or damage to the property between the date hereof and the date of closing, for any reason including fire, vandalism, flood, earthquake or act of God, the risk of loss shall be on PROMISING SELLER. If the property is destroyed or substantially damaged before the closing date, this Purchase Agreement shall become null and void, at PROMISING BUYER'S option, and earnest money shall be refunded to PROMISING BUYER; PROMISING BUYER and PROMISING SELLER shall sign a cancellation of Promise to Purchase Agreement within 30 days of notification from PROMSING SELLER of loss.

**NINETEENTH: WALK-THROUGH REVIEW:** Promising Buyer has the right to a walk-through review of the Property prior to closing.

**TWENTIETH: ENTIRE AGREEMENT:** This Annex, any other agreements, exhibits and any addenda or amendments signed by the parties, shall constitute the entire agreement between PROMISING SELLER and PROMISING BUYER, and supercedes any other written or oral agreements between PROMISING SELLER and PROMISING BUYER. This Purchase Agreement can be modified or cancelled only in writing signed by PROMISING SELLER and PROMISING BUYER or by operation of law. All monetary sums are deemed to be United States currency for purposes of this Agreement. PROMISING BUYER or PROMISING SELLER may be required to pay certain closing costs which may effectively reduce the proceeds from sale or increase the cash outlay at closing.

**TWENTY-FIRST: DEFAULT:** If PROMISING BUYER defaults in the performance of any of PROMISING BUYER's Obligations under this Agreement, PROMISING SELLER shall have the right to:

(i)     Terminate this Agreement,in which case, PROMISING BUYER shall forfeit all deposited money in liquidated damages.

(ii)    Commence an action in a court of competent jurisdiction seeking a judgment terminating this Agreement and awarding damages to PROMISING SELLER. In any such action for damages, PROMISING SELLER may also recover PROMISING SELLER'S attorneys' fees and costs; or

(iii)   initiate a civil action to compel PROMISING BUYER's specific performance of PROMISING BUYER's Obligations under this Agreement provided that PROMISING SELLER commences the action within six (6) months of the date of PROMISING BUYER's default. In any such action for specific performance, PROMISING SELLER may also recover PROMISING SELLER'S attorneys' fees and costs.

**TWENTY-SECOND**: NEW CONSTRUCTION WARRANTIES: PROMISING SELLER WARRANTS TO THE FIRST PURCHASER AND SUBSEQUENT PURCHASERS THAT: (1) DURING THE <u>ONE</u> YEAR PERIOD FROM AND AFTER THE WARRANTY DATE, THE DWELLING SHALL BE FREE FROM DEFECTS CAUSED BY FAULTY WORKMANSHIP AND DEFECTIVE MATERIALS DUE TO NON-COMPLIANCE WITH BUILDING STANDARDS; (2) DURING THE <u>TWO</u> YEAR PERIOD FROM AND AFTER THE WARRANTY DATE, THE DWELLING SHALL BE FREE FROM DEFECTS CAUSED BY FAULTY INSTALLATION OF PLUMBING, ELECTRICAL, COOLING SYSTEMS; AND (3) DURING THE <u>TEN</u> YEAR PERIOD FROM AND AFTER THE WARRANTY DATE, THE DWELLING SHALL BE FREE FROM MAJOR CONSTRUCTION DEFECTS." THE WARRANTY DATE IS THE DATE THE FIRST PROMISING TAKES LEGAL TITLE TO THE NEW DWELLING. WRITTEN CLAIMS UNDER THE WARRANTY MUST BE REPORTED TO THE PROMISING SELLER WITHIN THREE MONTHS AFTER DISCOVERY OF THE DEFECT. TO DETERMINE THE EXACT COVERAGE UNDER THE WARRANTY AND THE EXCLUSION TO THE WARRANTY.

**TWENTY-THIRD: IMPORTANT HEALTH NOTICE**: SOME OF THE BUILDING MATERIALS USED IN THIS HOME (OR THESE BUILDING MATERIALS) EMIT FORMALDEHYDE. EYE, NOSE, AND THROAT IRRITATION, HEADACHE, NAUSEA AND A VARIETY OF ASTHMA-LIKE SYMPTOMS, INCLUDING SHORTNESS OF BREATH, HAVE BEEN REPORTED AS A RESULT OF FORMALDEHYDE EXPOSURE. ELDERLY PERSONS AND YOUNG CHILDREN, AS WELL AS ANYONE WITH A HISTORY OF ASTHMA, ALLERGIES, OR LUNG PROBLEMS, MAY BE AT GREATER RISK. RESEARCH IS CONTINUING ON THE POSSIBLE LONG-TERM EFFECTS OF

EXPOSURE TO FORMALDEHYDE. REDUCED VENTILATION MAY ALLOW FORMALDEHYDE AND OTHER CONTAMINANTS TO ACCUMULATE IN THE INDOOR AIR. HIGH INDOOR TEMPERATURES AND HUMIDITY RAISE FORMALDEHYDE LEVELS. WHEN A HOME IS TO BE LOCATED IN AREAS SUBJECT TO EXTREME TEMPERATURES, AN AIR-CONDITIONING SYSTEM CAN BE USED TO CONTROL INDOOR TEMPERATURE LEVELS. OTHER MEANS OF CONTROLLED MECHANICAL VENTILATION CAN BE USED TO REDUCE LEVELS OF FORMALDEHYDE AND OTHER INDOOR AIR CONTAMINANTS. IF YOU HAVE ANY QUESTIONS REGARDING THE HEALTH EFFECTS OF FORMALDEHYDE, CONSULT YOUR DOCTOR OR LOCAL HEALTH DEPARTMENT.

**TWENTY-FOURTH: COVENANTS, CONDITIONS & RESTRICTIONS:** PROMISING SELLER warrants that PROMISING SELLER has delivered copies of all covenants, conditions and restrictions pertaining to the Property, and PROMISING BUYER acknowledges receipt and acceptance of all covenants, conditions and restrictions. **See Annex C.**

**TWENTY-FIFTH: HOME OWNER'S ASSOCIATION:** PROMISING SELLER warrants that PROMISING SELLER will deliver copies of all home owner's association documents pertaining to the Property, and PROMISING BUYER acknowledges acceptance of all home owner's association documents. **See Annex D.**

**TWENTY-SIXTH:** PROMISING SELLER warrants that it will provide property management services for PROMISING BUYER or will assign the right to provide property management services. **See Annex E**

**TWENTY-SEVENTH: TITLE & EXAMINATION:** Within a reasonable time after acceptance of this Agreement, PROMISING SELLER shall provide evidence of title, which shall include proper searches covering bankruptcies, state and federal judgments and liens, and levied and pending special assessments to PROMISING BUYER or PROMISING BUYER's designated title service provider, as follows:

PROMISING SELLER shall provide either: (1) a commitment for an owner's policy of title insurance issued by an insurer licensed to write title insurance in Panama. PROMISING SELLER shall pay the cost of an owner's policy, including the entire premium, title examination fee and the costs of evidence of title for such title insurance policy if no lender's policy is obtained; or only the additional cost of obtaining a simultaneously issued owner's policy if a lender's policy is obtained (PROMISING BUYER shall pay the premium and the title examination fee for the lender's policy).

PROMISING SELLER shall make best efforts to provide marketable title by the date of closing. In the event PROMISING SELLER has not provided marketable title by the date of closing, PROMISING SELLER shall have an additional 30 days to make title marketable or, in the alternative, PROMISING BUYER may waive the defects by written notice to PROMISING SELLER. In addition to the 30-day extension, PROMISING BUYER and PROMISING SELLER may by mutual agreement further extend the closing date. Lacking such extension, either party may declare this Purchase Agreement null and void; neither party shall be liable for damages hereunder to the other. PROMISING BUYER and PROMISING SELLER shall immediately sign a Cancellation of Purchase Agreement directing all earnest money paid hereunder to be refunded to PROMISING BUYER.

PROMISING SELLER warrants that prior to the closing, payment in full will have been made for all labor, materials, machinery, fixtures or tools furnished within the 120 days immediately preceding the closing in connection with construction, alteration or repair of any structure on, or improvement to, the property.

PROMISING SELLER warrants that PROMISING SELLER has not received any notice from any governmental authority as to violation of any law, ordinance or regulation. If the property is subject to restrictive covenants, PROMISING SELLER warrants that PROMISING SELLER has not received any notice from any person or authority as to a breach of the covenants. Any notices received by PROMISING SELLER will be provided to PROMISING BUYER immediately.

**TWENTY-EIGHTH: LIEN NOTICE:** (A) ANY PERSON OR COMPANY SUPPLYING LABOR OR MATERIALS FOR THIS IMPROVEMENT TO PROMISING BUYER'S PROPERTY MAY FILE A LIEN AGAINST YOUR PROPERTY IF THAT PERSON OR COMPANY IS NOT PAID FOR THE CONTRIBUTIONS. (B) UNDER PANAMA LAW, YOU HAVE THE RIGHT TO PAY PERSONS WHO SUPPLIED LABOR OR MATERIALS FOR THIS IMPROVEMENT DIRECTLY AND DEDUCT THIS AMOUNT FROM OUR CONTRACT PRICE, OR WITHHOLD THE AMOUNTS DUE THEM FROM US UNTIL 120 DAYS AFTER COMPLETION OF THE IMPROVEMENT, UNLESS PROMISING SELLER GIVES YOU A LIEN WAIVER SIGNED BY PERSONS WHO SUPPLIED ANY LABOR OR MATERIAL FOR THE IMPROVEMENT AND WHO GAVE YOU TIMELY NOTICE.

**TWENTY-NINTH:** Buyer acknowledges that closing for this transaction will be handled by Pardini y Asociados.  Buyer understands and acknowledges that Seller has a close business relationship with Pardini y Asociados.

**THRITITH:** Seller has agreed to assist Buyer in obtaining financing to purchase the Units. There are many banks who would be willing to help Buyer finance this purchase.  Buyer

understands that Seller uses America's Lending Link to help qualify buyers. Seller will recommend to Buyer Panamanian Banks to offer end financing for Buyer.

**THIRTY-FIRST:** This contract will be interpreted in accordance with the laws of the Republic of Panama and the Parties agree that any litigation or controversy coming from, or related with this contract, will be solved by means of arbitration with costs to be split equally by both parties.

**THIRTY-SECOND:** This contract can be protocolized and registered in the Public Registry in order for the corresponding marginal annotations to be made on THE PROPERTY. The Firm of Pardini & Asociados is hereby authorized to register the present contract of promise to sale and purchase in the Public Registry.

**THIRTY-THIRD:** It is PROMISING SELLER'S intent to develop a spa, resort style pool, restaurants, marina, and a welcome village that PROMISING BUYER will have special access to be defined further.

**THRITY-FOURTH:** Either party may transfer the rights and obligations under this contract to another person or corporation. All transfers from Buyer must receive previous written approval from Seller so that seller can financially qualify transferee for transaction.

This agreement is signed among the parties today 25th of June of 2004.

THE PROMISING SELLER

Name of Company:
PILLAR PANAMA, S.A.


Representative:
Name: Joe Haley
Signature: _____

THE PROMISING BUYER

Name of Company:


Representative:
Name: Ana Menjivar
Signature: _____

**Annexes:**
A     Survey or plat map
B     Villa plans and specifications
C     Covenants, Conditions, and Restrictions

D    Home Owner's Assocation Articles of Incorp & Bylaws (provided later)
E    Property Management Documentations (provided later)
F    Villa Construction Prints (provided later)
G    Option Pricing Addendum  (provided later)

# EXHIBIT    B

COPY

# PROMISE TO PURCHASE AND CONSTRUCTION AGREEMENT OF
# CONDOS / VILLAS

_____Joe Haley_____(REPRESENTATIVE OF PILLAR PANAMA), man/woman, citizen of U.S.A., bearer of the identification card/passport number 75963157, with office at Almirante, Bocas Del Toro Apartado 0104-00049, Panama, Republic of Panama acting in the name and representation of PILLAR PANAMA, S.A., a Panamanian company duly registered at Microjacket 440192, Redi Document 531092, since September 17, 2003, who from now on will be referred to as THE PROMISING SELLER, on one hand and on the other **Ana Menjivar** (REPRESENTATIVE OF BUYER), man/woman, citizen of United States, marital status of single, of age 46, bearer of the identification card/passport number _____, with residence at 4678 Sunland Avenue, Santa Rosa, CA, acting in his own name or acting in the name and representation of _____(name of corporation), a Panamanian company duly registered at Microjacket _____, Document _____, since _____ __, 200_, hereinafter referred to as THE PROMISING BUYER, by these means celebrate a promise to purchase contract according to the following Clauses:

**FIRST:** THE PROMISING SELLER declares that as evidenced in Public Deed number 5052 of 17May 20th, 2004, THE PROMISING SELLER is the rightfull owner of lot 746, Location Code 1003, Document Number 315200, Entry No. 1, of the Province of Bocas del Toro, Republic of Panama, which consists of a lot of land of 23 Hectares plus 6499 square meters (PUBLIC REGISTRY STATES 23 Hectares plus 6499 square meters). THE PROMISING SELLER declares that it has total possession of the property at the moment of signature of this contract.

**SECOND:** THE PROMISING SELLER by these means assumes the obligation to sell to THE PROMISING BUYER and THE PROMISING BUYER, in turn, assumes the obligation to buy from THE PROMISING SELLER, the following:

a.  A lot of land of 1980.518 square meters, block__2__, lot __21__ of Finca No. 746. The boundaries and measurements of THE PROPERTY are those described in the attached plat map, which is set as **Annex A** of the present contract and becomes part of the same.

b.  A condo/villa, model name **Cymbidium 2** as per specifications set forth in **Annex B** of this contract.

The lot of land and condo/villa hereinafter will be jointly called THE PROPERTY.

**THIRD:** The sale and purchase that by means of the present contract the Parties commit to carry out, will take place within a maximum term of thirty (30) calendar months counted starting from the date of the signature of this contract or up to the First (1st) of January of two thousand and seven (2007).

THE PROMISING BUYER acknowledges that PROMISING SELLER may utilize THE PROPERTY as collateral for construction financing during the term of this agreement. The PROMISING SELLER agrees to eliminate all such burdens and liens before THE PROPERTY is transferred to PROMISING BUYER.

**FOURTH:**    The price of sale of the property will be for the sum of **TWO HUNDRED EIGHTY TWO THOUSAND SEVEN HUNDRED AND FIFTY DOLLARS (US $282,750.00)**, currency of legal course of the United States of America. The sale price will be paid by THE PROMISING BUYER in the following manner:

(A)  By means of a check on behalf of PILLAR PANAMA, S.A. for the amount of **THIRTEEN THOUSAND SEVEN HUNDRED AND FIFTY DOLLARS (US $13,750.00)**, currency of legal tender of the United States of America, at the moment of the signature of the the reservation contract signed by the parties on **March 9th, 2004**. THE PROMISING SELLER accepts to have received this money to its entire satisfaction.

(B)  By means of a wire on behalf of PILLAR PANAMA, S.A. for the amount of **SEVENTY ONE THOUSAND AND SEVENTY FIVE DOLLARS (US $71,075.00)**, currency of legal tender of the United States of America, to cover the balance of the 30% down payment, Given to the PROMISING SELLER as a construction deposit for part payment of materials and labor, at the moment of signature of this contract. THE PROMISING SELLER accepts to have received this money to its entire satisfaction.

(C)  The balance sum of **ONE HUNDRED NINETY SEVEN THOUSAND NINE HUNDRED AND TWENTY FIVE DOLLARS (US $197,925.00)**, will be paid by THE PROMISING BUYER by means of a Check or wire transfer in favor of PILLAR PANAMA, S.A., as soon as the Public Deed whereby THE PROMISING SELLER sells THE PROPERTY to THE PROMISING BUYER, is duly registered in the Public Registry.

(D)  THE PROMISING BUYER acknowledges receipt and agreement of the client pricing worksheet that documents allowances chosen by THE PROMISING BUYER. By means of a

purchase agreement addendum, **Annex G,** final option allowance prices will be converted into actual option pricing within 180 days of his agreement that will finalize the final purchase price of the property.

**FIFTH:** THE PROMISING SELLER is obligated to sell and to pass over to THE PROMISING BUYER, THE PROPERTY object of this contract, free of obligations and must indemnify THE PROMISORY BUYER in the event of eviction.

**SIXTH:** The issuing and registration in the Public Registry of the Public Deed of sale and purchase will be responsibility of THE PROMISING SELLER. THE PROMISING BUYER will give THE PROMISING SELLER the documents here listed if PROMISING BUYER is a company:

a-      Good Standing certificate of the BUYER COMPANY.

b-      Minute whereby _____ is authorized by BUYER COMPANY to undertake the purchase and sale of the PROPERTY.

c-      Copy of annual franchise tax forms for BUYER COMPANY.

**SEVENTH:** In the event that THE PROMISING BUYER decides to not buy THE PROPERTY or that due to him upon construction completion, within the term pointed out in this contract, then, THE PROMISING SELLER will be entitled to retain for itself as indemnity the sum paid to such date, that is **SEVENTY ONE THOUSAND AND SEVENTY FIVE DOLLARS (US $71,075.00)** currency of legal tender in the United States of America.

**EIGHTH:** In the event that THE PROMISING SELLER defaults, it will return to THE PROMISING BUYER the sum of **SEVENTY ONE THOUSAND AND SEVENTY FIVE DOLLARS (US $71,075.00)** currency of legal course of the United States of America, received in payment as part of the sale price, as indemnity for losses and damages. This sum must be paid no later than thirty (30) days after having produced the nonfulfilment. Not receiving the appropriate governement approvals qualifes for nonfulfilment.

**NINTH:** THE PROMISING BUYER will assume the taxes and fees that arise from THE PROPERTY as of the date of registration of the sale and purchase deed in the Public Registry. THE PROMISING SELLER declares that all the taxes or fees that arise from lease and purchase of THE

PROPERTY up to the date of the registration of the sale and purchase deed in the Public Registry are properly paid.

**TENTH:** CHARACTERISTICS OF THE CONSTRUCTION OF THE CONDO/VILLA.

The residence will be approximately **167** square meters total area, complete construction specifications to follow, but including features as listed in PROMISING SELLER's specification, which is annexed to this contract as **Annex B**. A complete description of the property, in the form of a plat or survey map, is attached to this contract and forms part of the same as **Annex A**.

PROMISING SELLER will provide PROMISING BUYER with a very detailed specification document to be agreed upon before construction passes the foundation stage in **Annex F**. PROMISING BUYER will be responsible for choosing all standard choices of materials and options. PROMISING SELLER must comply with the quality and type of materials requested by PROMISING BUYER and agreed to in the **Annex F** by PROMISING SELLER.

**ELEVENTH**: Upon execution of this Agreement, and clearing of all contingencies, PROMISING SELLER shall continue to work with all reasonable diligence to final completion of villa.

**TWELFTH**: PROMISING BUYER agrees that the direction and supervision of the work forces, including subcontractors rests exclusively with PROMISING SELLER. PROMISING BUYER agrees not to interfere with or issue instructions to work forces, nor to contract for additional work with contractors or subcontractors except with PROMISING SELLER'S written permission. If permission is granted, such additional work shall not interfere with PROMISING SELLER 's completion of the construction of the home.

**THIRTEENTH: MODIFICATIONS:** Any significant change in the Plans and Specifications after **Annex F** is provided by PROMISING SELLER must be approved in writing by both parties citing by CHANGE ORDER any increase or decrease in the purchase price caused by such change. Unless otherwise agreed in writing, any such increase or decrease shall be reflected as an adjustment in the final purchase price. PROMISING BUYER agrees to pay a $500 fee for each CHANGE ORDER request and acknowledges that term under Section Three may be altered as a result. Materials of similar type and quality may be substituted without notice to or consent of PROMISING BUYER, so long as such change or substitution shall not substantially alter the character of the home or reduce the value thereof.

**FOURTEENTH: COMPLETION:** At closing, PROMISING SELLER shall furnish proper individual lien waivers for all labor and materials provided. PROMISING SELLER funds shall be escrowed for any work which cannot be completed because of weather conditions or because of mortgage requirements. Such escrowed funds shall be payable to PROMISING SELLER upon completion of such specified work.

**FIFTEENTH**: **PROMISING BUYER SHALL ASSUME** on date of closing all other special assessments levied as of the date of closing.

**SIXTEENTH: PROMISING SELLER SHALL PROVIDE FOR PAYMENT OF** special assessments pending as of the date of this Agreement for improvements that have been ordered by any assessing authorities.

**SEVENTEENTH**: General Warranties:  PROMISING SELLER warrants that buildings are or will be constructed entirely within the boundary lines of the Property.  PROMISING SELLER warrants that there is a right of access to the property from a public right of way.

**EIGHTEENTH: RISK OF LOSS:** If there is any loss or damage to the property between the date hereof and the date of closing, for any reason including fire, vandalism, flood, earthquake or act of God, the risk of loss shall be on PROMISING SELLER. If the property is destroyed or substantially damaged before the closing date, this Purchase Agreement shall become null and void, at PROMISING BUYER'S  option, and earnest money shall be refunded to PROMISING BUYER; PROMISING BUYER and PROMISING SELLER shall sign a cancellation of Promise to Purchase Agreement within 30 days of notification from PROMSING SELLER of loss.

**NINETEENTH: WALK-THROUGH REVIEW:** Promising Buyer has the right to a walk-through review of the Property prior to closing.

**TWENTIETH: ENTIRE AGREEMENT:** This Annex, any other agreements, exhibits and any addenda or amendments signed by the parties, shall constitute the entire agreement between PROMISING SELLER and PROMISING BUYER, and supercedes any other written or oral agreements between PROMISING SELLER and PROMISING BUYER. This Purchase Agreement can be modified or cancelled only in writing signed by PROMISING SELLER and PROMISING BUYER or by operation of law. All monetary sums are deemed to be United States currency for purposes of this Agreement. PROMISING BUYER or PROMISING SELLER may be required to pay certain closing costs which may effectively reduce the proceeds from sale or increase the cash outlay at closing.

**TWENTY-FIRST: DEFAULT:** If PROMISING BUYER defaults in the performance of any of PROMISING BUYER's Obligations under this Agreement, PROMISING SELLER shall have the right to:

(i)     Terminate this Agreement,in which case, PROMISING BUYER shall forfeit all deposited money in liquidated damages.

(ii)   Commence an action in a court of competent jurisdiction seeking a judgment terminating this Agreement and awarding damages to PROMISING SELLER. In any such action for damages, PROMISING SELLER may also recover PROMISING SELLER'S attorneys' fees and costs; or

(iii)  initiate a civil action to compel PROMISING BUYER's specific performance of PROMISING BUYER's Obligations under this Agreement provided that PROMISING SELLER commences the action within six (6) months of the date of PROMISING BUYER's default. In any such action for specific performance, PROMISING SELLER may also recover PROMISING SELLER'S attorneys' fees and costs.

**TWENTY-SECOND**: NEW CONSTRUCTION WARRANTIES: PROMISING SELLER WARRANTS TO THE FIRST PURCHASER AND SUBSEQUENT PURCHASERS THAT: (1) DURING THE <u>ONE</u> YEAR PERIOD FROM AND AFTER THE WARRANTY DATE, THE DWELLING SHALL BE FREE FROM DEFECTS CAUSED BY FAULTY WORKMANSHIP AND DEFECTIVE MATERIALS DUE TO NON-COMPLIANCE WITH BUILDING STANDARDS; (2) DURING THE <u>TWO</u> YEAR PERIOD FROM AND AFTER THE WARRANTY DATE, THE DWELLING SHALL BE FREE FROM DEFECTS CAUSED BY FAULTY INSTALLATION OF PLUMBING, ELECTRICAL, COOLING SYSTEMS; AND (3) DURING THE <u>TEN</u> YEAR PERIOD FROM AND AFTER THE WARRANTY DATE, THE DWELLING SHALL BE FREE FROM MAJOR CONSTRUCTION DEFECTS." THE WARRANTY DATE IS THE DATE THE FIRST PROMISING TAKES LEGAL TITLE TO THE NEW DWELLING. WRITTEN CLAIMS UNDER THE WARRANTY MUST BE REPORTED TO THE PROMISING SELLER WITHIN THREE MONTHS AFTER DISCOVERY OF THE DEFECT. TO DETERMINE THE EXACT COVERAGE UNDER THE WARRANTY AND THE EXCLUSION TO THE WARRANTY.

**TWENTY-THIRD: IMPORTANT HEALTH NOTICE**: SOME OF THE BUILDING MATERIALS USED IN THIS HOME (OR THESE BUILDING MATERIALS) EMIT FORMALDEHYDE. EYE, NOSE, AND THROAT IRRITATION, HEADACHE, NAUSEA AND A VARIETY OF ASTHMA-LIKE SYMPTOMS, INCLUDING SHORTNESS OF BREATH, HAVE BEEN REPORTED AS A RESULT OF FORMALDEHYDE EXPOSURE. ELDERLY PERSONS AND YOUNG CHILDREN, AS WELL AS ANYONE WITH A HISTORY OF ASTHMA, ALLERGIES, OR LUNG PROBLEMS, MAY BE AT GREATER RISK. RESEARCH IS CONTINUING ON THE POSSIBLE LONG-TERM EFFECTS OF

EXPOSURE TO FORMALDEHYDE. REDUCED VENTILATION MAY ALLOW FORMALDEHYDE AND OTHER CONTAMINANTS TO ACCUMULATE IN THE INDOOR AIR. HIGH INDOOR TEMPERATURES AND HUMIDITY RAISE FORMALDEHYDE LEVELS. WHEN A HOME IS TO BE LOCATED IN AREAS SUBJECT TO EXTREME TEMPERATURES, AN AIR-CONDITIONING SYSTEM CAN BE USED TO CONTROL INDOOR TEMPERATURE LEVELS. OTHER MEANS OF CONTROLLED MECHANICAL VENTILATION CAN BE USED TO REDUCE LEVELS OF FORMALDEHYDE AND OTHER INDOOR AIR CONTAMINANTS. IF YOU HAVE ANY QUESTIONS REGARDING THE HEALTH EFFECTS OF FORMALDEHYDE, CONSULT YOUR DOCTOR OR LOCAL HEALTH DEPARTMENT.

**TWENTY-FOURTH: COVENANTS, CONDITIONS & RESTRICTIONS:** PROMISING SELLER warrants that PROMISING SELLER has delivered copies of all covenants, conditions and restrictions pertaining to the Property, and PROMISING BUYER acknowledges receipt and acceptance of all covenants, conditions and restrictions. **See Annex C.**

**TWENTY-FIFTH: HOME OWNER'S ASSOCIATION:** PROMISING SELLER warrants that PROMISING SELLER will deliver copies of all home owner's association documents pertaining to the Property, and PROMISING BUYER acknowledges acceptance of all home owner's association documents. **See Annex D.**

**TWENTY-SIXTH:** PROMISING SELLER warrants that it will provide property management services for PROMISING BUYER or will assign the right to provide property management services. **See Annex E**

**TWENTY-SEVENTH: TITLE & EXAMINATION:** Within a reasonable time after acceptance of this Agreement, PROMISING SELLER shall provide evidence of title, which shall include proper searches covering bankruptcies, state and federal judgments and liens, and levied and pending special assessments to PROMISING BUYER or PROMISING BUYER's designated title service provider, as follows:

PROMISING SELLER shall provide either: (1) a commitment for an owner's policy of title insurance issued by an insurer licensed to write title insurance in Panama. PROMISING SELLER shall pay the cost of an owner's policy, including the entire premium, title examination fee and the costs of evidence of title for such title insurance policy if no lender's policy is obtained; or only the additional cost of obtaining a simultaneously issued owner's policy if a lender's policy is obtained (PROMISING BUYER shall pay the premium and the title examination fee for the lender's policy).

PROMISING SELLER shall make best efforts to provide marketable title by the date of closing. In the event PROMISING SELLER has not provided marketable title by the date of closing, PROMISING SELLER shall have an additional 30 days to make title marketable or, in the alternative, PROMISING BUYER may waive the defects by written notice to PROMISING SELLER. In addition to the 30-day extension, PROMISING BUYER and PROMISING SELLER may by mutual agreement further extend the closing date. Lacking such extension, either party may declare this Purchase Agreement null and void; neither party shall be liable for damages hereunder to the other. PROMISING BUYER and PROMISING SELLER shall immediately sign a Cancellation of Purchase Agreement directing all earnest money paid hereunder to be refunded to PROMISING BUYER.

PROMISING SELLER warrants that prior to the closing, payment in full will have been made for all labor, materials, machinery, fixtures or tools furnished within the 120 days immediately preceding the closing in connection with construction, alteration or repair of any structure on, or improvement to, the property.

PROMISING SELLER warrants that PROMISING SELLER has not received any notice from any governmental authority as to violation of any law, ordinance or regulation. If the property is subject to restrictive covenants, PROMISING SELLER warrants that PROMISING SELLER has not received any notice from any person or authority as to a breach of the covenants. Any notices received by PROMISING SELLER will be provided to PROMISING BUYER immediately.

**TWENTY-EIGHTH: LIEN NOTICE:** (A) ANY PERSON OR COMPANY SUPPLYING LABOR OR MATERIALS FOR THIS IMPROVEMENT TO PROMISING BUYER'S PROPERTY MAY FILE A LIEN AGAINST YOUR PROPERTY IF THAT PERSON OR COMPANY IS NOT PAID FOR THE CONTRIBUTIONS. (B) UNDER PANAMA LAW, YOU HAVE THE RIGHT TO PAY PERSONS WHO SUPPLIED LABOR OR MATERIALS FOR THIS IMPROVEMENT DIRECTLY AND DEDUCT THIS AMOUNT FROM OUR CONTRACT PRICE, OR WITHHOLD THE AMOUNTS DUE THEM FROM US UNTIL 120 DAYS AFTER COMPLETION OF THE IMPROVEMENT, UNLESS PROMISING SELLER GIVES YOU A LIEN WAIVER SIGNED BY PERSONS WHO SUPPLIED ANY LABOR OR MATERIAL FOR THE IMPROVEMENT AND WHO GAVE YOU TIMELY NOTICE.

**TWENTY-NINTH**: Buyer acknowledges that closing for this transaction will be handled by Pardini y Asociados. Buyer understands and acknowledges that Seller has a close business relationship with Pardini y Asociados.

**THRITITH**: Seller has agreed to assist Buyer in obtaining financing to purchase the Units. There are many banks who would be willing to help Buyer finance this purchase. Buyer

understands that Seller uses America's Lending Link to help qualify buyers. Seller will recommend to Buyer Panamanian Banks to offer end financing for Buyer.

**THIRTY-FIRST:** This contract will be interpreted in accordance with the laws of the Republic of Panama and the Parties agree that any litigation or controversy coming from, or related with this contract, will be solved by means of arbitration with costs to be split equally by both parties.

**THIRTY-SECOND:** This contract can be protocolized and registered in the Public Registry in order for the corresponding marginal annotations to be made on THE PROPERTY. The Firm of Pardini & Asociados is hereby authorized to register the present contract of promise to sale and purchase in the Public Registry.

**THIRTY-THIRD:** It is PROMISING SELLER'S intent to develop a spa, resort style pool, restaurants, marina, and a welcome village that PROMISING BUYER will have special access to be defined further.

**THRITY-FOURTH:** Either party may transfer the rights and obligations under this contract to another person or corporation. All transfers from Buyer must receive previous written approval from Seller so that seller can financially qualify transferee for transaction.

This agreement is signed among the parties today 25th of _june_ of 200ᵧ.

THE PROMISING SELLER                    THE PROMISING BUYER

Name of Company:                        Name of Company:
PILLAR PANAMA, S.A.

Representative:                         Representative:
Name: Joe Haley                         Name: Ana Menjivar
Signature: _____              Signature: _____

**Annexes:**

| | |
|---|---|
| A | Survey or plat map |
| B | Villa plans and specifications |
| C | Covenants, Conditions, and Restrictions |

D     Home Owner's Assocation Articles of Incorp & Bylaws (provided later)
E     Property Management Documentations (provided later)
F     Villa Construction Prints (provided later)
G     Option Pricing Addendum  (provided later)

# EXHIBIT     C

**From:** A Menjivar (vpd520@yahoo.com)
**To:** Joe Haley; Chris Nolan
**Date:** Monday, October 22, 2007 10:06:52 AM
**Cc:** scott harris; Wright Thurston; wthurston@redfrogbeach.com; EJ Gorman
**Subject:** Rescision of Purchase Agreement

I am appalled that it has been over four (4) months since I requested that my furniture money (i.e. **$60,931.96**) be returned to me and I have yet to receive reimbursement in full.   This tends to confirm my biggest fear that the rumors of Red Frog's insolvency are true.   Consequently, because Red Frog is currently in breach of both signed *Promise to Purchase and Construction Agreement of Condos/Villas,* I am hereby notifying you that I no longer wish to pursue the purchase of Lot 21 (Tortuga villa) and Lot 36 (Cymbidium villa) and am hereby ***rescinding both contracts***.   I am, therefore, demanding the immediate return of all monies I have paid to Red Frog, specifically, the down payments on the villas (totalling U.S. **$165,800.00**).   Moreover, I am demanding damages in the amount of U.S. $75,000.00 per villa, as compensation for the cost of borrowed funds; loss of interest; loss of other investment opportunities and other associated expenses (e.g. incorporation costs, wire transfer fees; attorneys' fees, etc.).


As stated in my earlier emails to you, I intend to file a lawsuit in order to collect these funds.  At this time I have lost hope of receiving reimbursement or of ever realizing this dream that was Red Frog Beach Resort.    I am moving forward with my lawsuit.  If all funds are paid prior to the filing, then, obviously, that will resolve the matter.


Ana Menjivar
Santa Rosa, CA
415-420-4637 (cell)

_____

Do You Yahoo!?
Tired of spam? Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

**EXHIBIT    D**

**From:** EJ Gorman (egorman@redfrogbeach.com)
**To:** vpd520@yahoo.com
**Date:** Tuesday, November 7, 2006 11:40:07 AM
**Cc:** 'Janice Bartone Mary Heither'; 'Janice Bartone'
**Subject:** RE: Menjivar lot 36 - status on 2nd half of Design Center selections

Ana

Sina just forwarded me your email regarding your desire to cancel your Design Center order.

This is an order you placed with us 4 months ago. On July 5, 2006 you signed a contract committing to purchase these items and to pay us $35,856.00 by August 4, 2006. We received 50% on August 4, and the remaining 50% balance of $17,928.00 + Interest is now past due by over 30 days.

Nowhere in the contract that you signed does it say you can cancel the order or that you are entitled to a full refund. The fact is that we have already ordered and paid vendors for most of the items that you ordered. We cannot cancel those orders or get that money back from the vendors. Many hours of work have also been done over the past 4 months by our purchasing department to process your order.

Just to clarify, under the contract we are obligated to provide you with the goods that you ordered and you are obligated to pay for those goods. Nowhere in that contract does it indicate that the order can be cancelled or that a refund can be obtained. In the interest of being reasonable, and as we have done in 1 other case, we are willing to cancel the order with a 30% re-stocking fee to cover the real costs we have already incurred for the order, and the additional administrative and logistical costs we will incur should you choose to cancel the order.

Please let us know as soon as possible how you would like to proceed.

Best regards,

EJ

---

**From:** Sina Pfau [mailto:sina@redfrogbeach.com]
**Sent:** Tuesday, November 07, 2006 2:07 PM
**To:** 'EJ Gorman'
**Subject:** FW: Menjivar lot 36 - status on 2nd half of Design Center selections

EJ,

Here is the email from Ana Menjivar...

Sina

---

**From:** A Menjivar [mailto:vpd520@yahoo.com]
**Sent:** Tuesday, November 07, 2006 12:49 PM
**To:** sina@redfrogbeach.com
**Subject:** Re: Menjivar lot 36 - status on 2nd half of Design Center selections

Was there a written policy somewhere indicating that there would be a 30% stocking fee? I don't think these can be made up as we go along. Policy has to be clearly stated. I will not agree to being penalized such an exhorbitant amount. I want to see receipts indicating what furniture has been ordered. I also want an explanation specifiying how you have arrived at the 30% penalty.
Sincerely,
Ana Menjivar

PS: I also need a completion date on both properties.

----- Original Message ----
From: Sina Pfau <sina@redfrogbeach.com>
To: A Menjivar <vpd520@yahoo.com>
Cc: Chris Nolan <cnolan@redfrogbeach.com>; EJ Gorman <egorman@redfrogbeach.com>
Sent: Tuesday, November 7, 2006 9:42:43 AM
Subject: RE: Menjivar lot 36 - status on 2nd half of Design Center selections

Hello Ana,

I hope you are doing well. I just checked on your furniture order for your lot 36. Unfortunately by now, part of your furniture has already been ordered since your selections were finalized on **July 5, 2006**.
I remember we had a similar case in which the client had to cancel the furniture order. We had to charge them a 30% stocking fee on their furniture selections.
We are going to double check on what exactly has been ordered and will get back to you shortly with the information.

Best regards,
Sina

---

**From:** A Menjivar [mailto:vpd520@yahoo.com]
**Sent:** Monday, November 06, 2006 12:16 PM
**To:** sina@redfrogbeach.com
**Cc:** Chris Nolan
**Subject:** Re: Menjivar lot 36 - status on 2nd half of Design Center selections
Hi Sina:

As we discussed in our last conversation, you were going to look into whether the furniture has been ordered. If it has not been ordered, I will need to cancel my order and get a refund of my money. At this time, there is no way I can come up with the balance. I'm sorry.

Ana Menjivar

----- Original Message ----
From: Sina Pfau <sina@redfrogbeach.com>
To: vpd520@yahoo.com
Sent: Wednesday, November 1, 2006 10:42:00 AM
Subject: Menjivar lot 36 - status on 2nd half of Design Center selections

Hello Ana,

I hope you are doing well. I just want to check on the status of the payment for $17,928.00 for your Design Center selections. Do you have any news on that?

Please keep me updated on that.

Thanks so much!

Best,

Sina Pfau
Sales & Service Coordinator
(888) 417-5241 Toll-free
(011) 507-757-9749 Office
(952) 216-0102 Fax

sina@redfrogbeach.com
www.RedFrogBeach.com

The information contained in this e-mail is CONFIDENTIAL INFORMATION and may be legally privileged. It is intended for the individual or entity named above. If you are not the intended recipient, you are hereby notified that any use, review, dissemination, distribution or copying of this document is strictly prohibited. If you receive this document in error, please immediately notify us by telephone and destroy the original message. Thank you.

**EXHIBIT    E**

**From:** Scott Harris (sharris@redfrogbeach.com)
**To:** 'A Menjivar'
**Date:** Monday, June 18, 2007 7:59:20 PM
**Cc:** 'Ryan Bullock'
**Subject:** RE: Refund of Furniture Advances

Ana,

I just wanted you to know that I saw this email tonight – Monday evening and I am forwarding on to our attorney and rest of management team. I happen to be taking my first vacation this year with my family this week and I will not be back until next Monday. I will advise you then of our position regarding this matter.

Scott Harris
Executive Vice President



801-491-3900
sharris@redfrogbeach.com
www.redfrogbeach.com

The information contained in this e-mail is CONFIDENTIAL INFORMATION and may be legally privileged. It is intended for the individual or entity named above. If you are not the intended recipient, you are hereby notified that any use, review, dissemination, distribution or copying of this document is strictly prohibited. If you receive this document in error, please immediately notify us by telephone and destroy the original message. Thank you.

---

**From:** A Menjivar [mailto:vpd520@yahoo.com]
**Sent:** Sunday, June 17, 2007 10:27 PM
**To:** sharris@redfrogbeach.com
**Cc:** Ryan Bullock
**Subject:** Refund of Furniture Advances

Scott:

News about the RF project continues to be bleak. My understanding, for example, is that the strike continues. Additionally, the units, once completed, will probably not be rented on a regular basis as was initially represented to us by RF. (I hurriedly purchase furniture because I wanted the villas to be rent ready.) Lastly, due to the passage of time, it appears that RF is in breach of its purchase agreement contract. Consequently, I see no need to furnish the villas at this time. To date, I have advanced a total of **$60,931.96** (Tortuga Lot 21 = $43,003.96. Cymbidium Lot 36 $17,928.00) for furniture that, apparently has not been ordered or received, and which is useless at this time. Therefore, I am demanding an immediate and <u>unconditional</u> full refund of those monies. I do NOT want 'credit' towards the villas or anything else. I want the cash returned in full. Please contact me so that I can provide you the information for the wire transfer of these funds.

Scott, you have always been cordial and respectful and I thank you. I don't think that I need to express to you how sorry I am things have deteriorated to this extent. However, if I do not receive these funds within the next few weeks, I, with the support of other villa investors, including Les Fradkin, will contact the Panamanian Ambassador regarding RF's potential violation of Law 8 which, as you know, regulates and provides tax incentives for developments such as this one. If I have not heard from you by **June 29, 2007**, I will assume that RF has no interest in returning my furniture monies and will proceed with my complaints to the Panamanian authorities and will, furthermore, pursue this matter in federal court here in the

United States .

Yours truly,
Ana Menjivar
Lot Nos. 21 & 36
415-420-4637

---

Luggage? GPS? Comic books?
Check out fitting gifts for grads at Yahoo! Search.

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.472 / Virus Database: 269.8.17/850 - Release Date: 6/15/2007 11:31 AM


No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.472 / Virus Database: 269.8.17/850 - Release Date: 6/15/2007 11:31 AM